*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANGELA BOUGGESS,

*Plaintiff-Appellee,*

*v.*

No. 06-5619

MCKENZIE MATTINGLY,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00180—Charles R. Simpson III, District Judge.

Argued: March 5, 2007

Decided and Filed: April 16, 2007

Before: BOGGS, Chief Judge; and DAUGHTREY and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kent Wicker, REED WICKER, Louisville, Kentucky, for Appellant. Garry R. Adams, CLAY, KENEALY, WAGNER, ADAMS & HALL, Louisville, Kentucky, for Appellee. **ON BRIEF:** Kent Wicker, Steven S. Reed, REED WICKER, Louisville, Kentucky, for Appellant. Garry R. Adams, CLAY, KENEALY, WAGNER, ADAMS & HALL, Louisville, Kentucky, for Appellee.

---

**OPINION**

---

BOGGS, Chief Judge. This civil rights case stems from the shooting death of Michael Newby by Officer McKenzie Mattingly in West Louisville. It comes before us on an interlocutory appeal from the district court's denial of the appellant's motion for summary judgment on qualified immunity and state-law immunity grounds. Before the district court, Angela Bouggess, the administrator of Newby's estate, raised a Fourth Amendment claim under 42 U.S.C. § 1983 and various state-law tort claims. To decide this case, we need only ask whether an officer who employs deadly force against a fleeing suspect without reason to believe that the suspect is armed or otherwise poses a serious risk of physical harm is entitled to either qualified immunity or immunity under the law of Kentucky. We hold that he is entitled to neither. Accordingly, we affirm the judgment of the district court.

1

I

Bouggess raises a Fourth Amendment claim under 42 U.S.C. § 1983, a statute that provides a cause of action for redress against persons acting under color of law for "deprivation[s] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. The Supreme Court has held that defendants in such suits are entitled to qualified immunity from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A plaintiff can overcome that immunity only by showing that (1) the defendant violated his constitutional or statutory rights and (2) the right at issue was sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Baranski v. Fifteen Unknown Agents of the BATF*, 452 F.3d 433, 438 (6th Cir. 2006) (en banc).

The availability of interlocutory appeal from the denial of qualified immunity is an exception to the general rule that an appeal can be taken only from a final judgment. But that exception is a limited one. We have jurisdiction to consider an interlocutory appeal only if that appeal raises a pure question of law. *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). Thus, we have jurisdiction to consider a defendant's claim that the facts alleged by the plaintiff, if proven, would not show a violation of clearly established constitutional law, *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309-10 (6th Cir. 2005), but not to consider a defendant's claim that the district court erred in constructing its view of the facts in the light most favorable to the plaintiff, *Johnson*, 515 U.S. at 317-20. At times in this appeal, Mattingly could be taken to raise a mix of factual and legal arguments. To retain our jurisdiction under *Johnson*, we consider only the legal issues and interpret Mattingly's appeal as conceding, for these purposes only, the facts as given by Bouggess.

II

Because this case comes to us on summary judgment, we construe the facts in the light most favorable to Bouggess. Fed. R. Civ. P. 56(c). If Bouggess can prevail under those facts, the case is inappropriate for resolution on interlocutory appeal and must be remanded. As we have held, when "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the "jury becomes the final arbiter of [a] claim of immunity." *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989).

On the evening of January 3, 2004, Officer McKenzie Mattingly of the Louisville Metro Police Department was involved in a drug-sting operation. He had planned to stage a drug transaction with some individuals in the parking lot of H & S Foods at 46th and West Market Streets in Louisville. Mattingly had backup officers listening over a wire transmitter. Officer Thomerson was the "eye" of the operation. As Mattingly waited in his vehicle, he was approached by a number of individuals who may have offered to sell him narcotics. Nineteen-year-old Michael Newby was one of those individuals. Mattingly did not think Newby was armed.[1]

During the operation, the other suspects on the scene reached into Mattingly's car and took some of Mattingly's money. They then ran away. Mattingly thought at this point that none of the suspects remained near the car. He then got out of the car to see which way the suspects ran so that

---

[1]Mattingly claims that Newby lifted his shirt up and jumped back from the car window. Mattingly claimed that such a maneuver is called a "security check" and that it indicated to him that Newby was armed with a concealed weapon. Mattingly's testimony provides the sole support for that assertion. However, given the chance, Mattingly did not notify other officers that he thought he was in danger, even though he had a code word to do so. The audio tape of the operation failed to indicate that any of the vocal sounds claimed by Mattingly to have surrounded the security check ever took place. Because these facts are disputed, and must be viewed in the light most favorable to Bouggess for the purposes of this appeal, we must assume Mattingly did not think Newby was armed.

he could radio that information to his fellow officers. Mattingly did not radio for help or in any way indicate to other officers that they should be concerned that any of the suspects (including Newby) might be armed.

Upon Mattingly's exit from the vehicle, he saw Newby nearby, bending down to pick up a twenty-dollar bill. Mattingly sought to arrest Newby, but a struggle ensued between the two men. No guns were drawn and no shots were fired during the struggle.[2]

After the struggle, Newby broke free from Mattingly and ran directly away from Mattingly toward three eyewitnesses in a car, and also within view of the H & S Foods manager. Mattingly then drew his gun and fired at least three shots at Newby.[3] According to the medical examiner's report, three shots struck Newby in the back.

Newby, now struck three times by bullets from Mattingly's firearm, fled around a corner and sat down. Mattingly and Thomerson then approached Newby. Mattingly did not warn Thomerson that Newby might have a weapon. JA 156. Another officer on the scene, with his gun holstered, then approached Newby to handcuff him. Mattingly did not warn that officer that Newby might be armed. When Newby struggled with the officers during handcuffing and following handcuffing, Mattingly did not alert the officers that Newby might be armed. Newby died from his injuries soon after the shooting.

Newby was, in fact, carrying a firearm in his waistband. JA 227.

### III

Viewing the facts as given above, the question is whether Mattingly violated Newby's clearly established constitutional rights.

### A

"[A]pprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). This court assesses the reasonableness of a seizure in distinct stages. An officer's prior errors in judgment do not make a shooting unreasonable as long as the officer acted reasonably during the shooting itself and the few moments directly preceding it. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir.

---

[2]According to Mattingly, he attempted to arrest Newby, but Newby kept fighting and "had this look in his eyes like, he just had this look in his eyes like, man I'm going to kill you." Mattingly then drew his weapon. He testified that Newby was trying to take it from him during the struggle and that one shot was fired toward the ground during the struggle. JA 39-40. Mattingly testified that he thought he had been shot in the foot.

Mattingly's account of the struggle is substantially disputed. Four eyewitnesses indicate that no guns were drawn and that no shots were fired during the struggle. Even Mattingly acknowledges that he was not, in fact, shot in the foot. The eyewitnesses also agree that Newby did nothing but run away before Mattingly opened fire. Even Officer Thomerson, the "eye" of the operation, indicated that the only time he saw Newby check his waistband was after Mattingly opened fire. JA 47, 151. The witnesses all indicate that at least three shots, but perhaps as many as five, were fired in rapid succession at Newby. JA 109, 113, 115, 117. The record also indicates that Mattingly's gun (a Glock model 22) had an ammunition cartridge with ten remaining bullets, along with one live round in the gun's chamber, after the shooting. JA 147. The record also indicates that a full Glock magazine contains fifteen bullets. JA 147. Thus, if Mattingly's weapon initially had a full magazine, it would have been fired either four or five times that evening, depending on whether the weapon also initially had one round in the chamber.

[3]Although Mattingly claims Newby was feeling for his gun and that Newby was facing Mattingly while backing away more slowly, four eyewitnesses indicate that Newby ran directly away from Mattingly toward the liquor store's drive-thru line.

1996). In other words, whether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position. *Brousseau v. Haugen*, 543 U.S. 194, 197 (2004). That objective assessment requires asking whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. Under that standard, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Ibid.* Absent such probable cause, however, a police officer may not seize a fleeing felon by employing deadly force. *Id.* at 11-12.

In applying *Garner*'s "probable cause" standard, the Sixth Circuit has focused on the following non-exhaustive list of factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).[4] Using those factors and other relevant facts, it is our task to determine whether Mattingly had an objectively reasonable belief that Newby posed an imminent threat of serious physical harm to him or to others. If Mattingly did not have such a belief, then his use of deadly force violated the Fourth Amendment. *Saucier*, 533 U.S. at 205.

B

Thus, the question in this case is whether, under the foregoing standard, Mattingly had probable cause to believe that Newby posed a threat of serious physical harm to Mattingly or to others. *Garner*, 471 U.S. at 11-12; *Dickerson*, 101 F.3d at 1161-63. The facts, when viewed in the light most favorable to Bouggess, demonstrate that Mattingly did not have such probable cause.

1

It is crucial for the purposes of this inquiry to separate Officer Mattingly's decision-points and determine whether each of his particular decisions was reasonable. *Dickerson*, 101 F.3d at 1162. Officer Mattingly made two decisions. First, he decided to arrest Newby, and second, after Newby broke free, he decided to shoot Newby. It cannot reasonably be contended (and plaintiff-appellee does not contend) that merely arresting Newby would have been a violation of the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Even under the facts as we must view them, Mattingly had probable cause to believe Newby was committing at least some crime.

The question of whether Mattingly's second decision was reasonable is the nub of this case. The relevant time for the purposes of this inquiry is the moment immediately preceding the shooting. *Dickerson*, 101 F.3d at 1162. That is, we must focus whether Officer Mattingly had probable cause to believe that Newby posed a serious danger to him or to others *while Newby was running away*. *Ibid*. *See also Estate of Bing v. City of Whitehall*, 456 F.3d 555, 570 (6th Cir. 2006).

---

[4] It is axiomatic that, because we make a probable cause inquiry, we must focus on the facts the officer knew at the time. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. For example, imagine a person walking in a crowded city. He has a small vial of a deadly toxin in his breast pocket. An officer walks down the street and fires one shot into the person's head, without knowing anything about the vial. In that case, the officer certainly could not claim his conduct was legal, because he lacked probable cause to believe the suspect posed a serious danger to anyone, even though the suspect did.

2

After Newby had broken free from Mattingly's custody and had run about ten feet from Mattingly, did Mattingly have probable cause to believe that Newby posed an imminent danger of serious physical harm to him or to others? Examining the information available to Mattingly at the time, precedent binding on this court, and viewing the facts in the light most favorable to the Bouggess, it is clear that Mattingly did not have probable cause sufficient to open fire.

Under the facts properly viewed at this stage, Mattingly did not know or suspect that Newby had a firearm. Too much evidence throws doubt on Mattingly's bare assertion that he suspected that Newby had a weapon. Moreover, Mattingly's arguments on this point amount to disputes over the factual inferences made by the district court on summary judgment.[5] As such, under *Johnson*, we cannot consider them on this interlocutory appeal. 515 U.S. at 317-20.

Newby's only crimes, so far as Mattingly suspected, were dealing crack and physically resisting arrest. If an officer seeks to arrest someone for dealing crack cocaine and the suspect resists, using his hands, and then flees, may the officer shoot him? Under the governing doctrine, the answer is clearly "no." Officers cannot open fire in such circumstances absent more evidence that the suspect poses a danger to officers or to the public. *Garner*, 471 U.S. at 11.

Newby's first crime was dealing crack. On appeal, Mattingly contends in his reply brief that "trained police officers know that drug dealers, especially crack cocaine dealers, usually carry guns." *Reply Br. of Appellant*, at 5 (citing *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)). Mattingly seems to imply that a general notion that crack dealers are dangerous, rather than a particularized and supported sense of serious danger about a particular confrontation, justifies the use of deadly force. The Supreme Court and this court have never accepted such a sweeping generalization. *Garner*, 471 U.S. at 11-12; *Dickerson*, 101 F.3d at 1162. We will not do so today.

Newby's second crime was resisting arrest and fleeing the scene. It cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of *serious* physical harm to the officer or to others. *Cf. Garner*, 471 U.S. at 11 ("It is not better that all felony suspects die than that they escape."). Merely resisting arrest by wrestling oneself free from officers and running away would justify the use of *some* force to restrain the suspect. For example, this court has held that officers may tackle a suspect who resists. *Lyons v. City of Xenia*, 417 F.3d 565, 577 (6th Cir. 2005); *Burchett v. Keifer*, 310 F.3d 937, 944 (6th Cir. 2002).

However, while such action by a suspect justifies force, it does not justify *deadly* force, especially when the struggle has concluded and the suspect is in flight. *Garner*, 417 U.S. at 10-12. *See also Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir. 2006) (denying qualified immunity when officer used a "vascular neck restraint," *i.e.* a choke hold, to restrain an individual who posed no threat to the officers or to anyone else); *Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 U.S. App. LEXIS 1465, at *2-3, *15 (6th Cir. Jan. 31, 2000) (unpublished) (denying summary judgment on qualified immunity grounds when deadly force was employed after a suspect tackled an officer and wrestled him to the ground because there was a disputed issue of fact as to whether the suspect tried

---

[5]Even were we to accept that Mattingly had a hunch that Newby was armed, Mattingly still could not prevail. In *Dickerson*, officers were *certain* that the suspect possessed a firearm. They were also certain that the suspect had fired it inside his home within minutes of their arrival. However, qualified immunity was denied for want of probable cause because there was a disputed issue of fact as to whether, at the time the suspect was shot, he posed a danger to officers. 101 F.3d at 1151-62. Mattingly's mere hunch that Newby had a firearm cannot be enough to meet his burden. *Ibid.*; *Brandenburg*, 882 F.2d at 213-14. *See also Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005).

to take away the officer's gun); *Cardona v. City of Cleveland*, No. 97-3037, 1997 U.S. App. LEXIS 32113, at *9-14 (6th Cir. Nov. 10, 1997) (unpublished) (denying qualified immunity where officer and suspect struggled, and the suspect was shot during the struggle, where there was a disputed issue of fact as to whether the officer and suspect struggled over a gun). *Cf. Donovan v. Thames*, 105 F.3d 291, 297 (6th Cir. 1997) (holding that conviction for resisting arrest did not preclude the bringing of a § 1983 action for excessive force in violation of the Fourth Amendment); *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002) (determining that the officers' employment of deadly force was reasonable because the suspect, in resisting arrest, had "demonstrated that he would fire on any officers who entered the house.").

Finally, Mattingly never warned Newby that he might shoot, as required by *Garner* when feasible under the circumstances. Nothing indicates that a warning was infeasible. *Craighead*, 399 F.3d at 962 (denying qualified immunity, in part, because "[t]he facts we are required to assume show that a warning was feasible but not given"). Moreover, nothing in the facts as they must be viewed at this stage indicates that Newby ever threatened Mattingly or anybody else in the area with serious harm. Mattingly has offered only a hunch, a crack deal, a hand-to-hand struggle, and a "look in [Newby's] eyes" to support his claim that his choice to shoot Newby three times in the back was reasonable under the Fourth Amendment. Other facts that Mattingly has offered are disputed and must be read in the light most favorable to Bouggess at this stage. As a result, it is clear under *Garner* and its progeny that Newby's Fourth Amendment rights were violated.

3

To resist this conclusion, Mattingly argues that Newby struggled with him and thus that Newby "assaulted a police officer." That is a subject of dispute. A reasonable fact-finder could conclude that Mattingly tried to arrest Newby and that Newby merely resisted and ran away. We cannot view the facts in the light most favorable to the defendant on this appeal. Moreover, "resisting arrest," without probable cause to believe that the suspect poses a *serious* danger to anyone, cannot be enough to justify deadly force. *Cf. Garner*, 417 U.S. at 10-12. In any case, when Mattingly began to fire, the "resisting" would have concluded and Newby merely would have been in flight. A suspect's flight on foot, without more, cannot justify the use of deadly force.

Mattingly also relies on several cases from this circuit that he claims support his position. In each case he cites, with one exception, this court either reversed the denial of qualified immunity or affirmed the grant of qualified immunity. To that extent, and to that extent alone, they support Mattingly's position. However, in each case, the suspect in question was both known by the police to possess a weapon and had indicated an intent to use that weapon against the police or others.[6] *See Gaddis v. Redford Township*, 364 F.3d 763, 767 (6th Cir. 2003) (describing the suspect's possession of a knife and his swinging it violently at police officers); *Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000) ("They confronted him as a dangerous armed man who ignored their reasonable command to stop. That command obviously included the direction to stop pointing his gun at them, and this, too, was ignored."); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (noting the suspect's brandishment of a machete within four feet of officers and another individual).

---

[6] Mattingly also relies on cases dealing with suspects in high-speed chases, claiming that "courts have similarly dismissed claims when the suspect was armed with nothing more than an automobile." *Br. of Appellant*, at 17. We need not address this claim in great detail. Reasonable people know that automobiles – large, heavy, metal objects – are dangerous when driven recklessly and at high speeds. The cases Mattingly cites do not support a grant of qualified immunity in this case because they deal with reckless drivers who posed objective, serious risks to others. *See, e.g.*, *Dudley v. Eden*, 260 F.3d 722, 727 (6th Cir. 2001); *Scott v. Clay County*, 205 F.3d 867, 872-73 (6th Cir. 2000) (describing events in which a suspect had run a driver off the road, engaged the police in a high-speed chase in excess of 80 mph, flown off the road into the woods, and driven his car toward officers). Michael Newby was not a car driven recklessly; he was running from the police on foot.

The exception is *Brandenburg*, 882 F.2d at 213-14. In that case, an individual had fired six shots, at least two of which were into the air. He also told officers to leave his property or they would be killed. One officer opened fire on the individual when the individual moved to pick up his rifle again. In that case, we granted qualified immunity to two officers whose negligence in serving an arrest warrant arguably created the dangerous situation. However, we denied qualified immunity to the officer who fired the fatal shots because there was an issue of fact as to whether the suspect had pointed his gun at the other two officers just before the shooting. *Id.* at 215. It is unclear to us why Mattingly relies on *Brandenburg* in his brief; we believe that he has mischaracterized our opinion in that case. *Brandenburg* illustrates quite clearly why Mattingly is not entitled to qualified immunity on the facts as we must view them here.

One case decided by this court after briefing was complete in this case might provide support for Mattingly's claim that he did not violate Newby's Fourth Amendment rights. In *Livermore v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), this court held that it was not a violation of the Fourth Amendment for a police sniper to shoot a suspect armed with a rifle during an armed standoff between the suspect and police. *Id.* at 404-06. The suspect who was shot and killed had been present when an accomplice fired shots at a news helicopter. *Id.* at 401. The suspect had set the farmhouses on fire and had sought to escape with his rifle through the woods. *Ibid.* Moments after aiming his rifle at police, he was shot by a police sniper. *Ibid.* There were disputed issues of fact as to whether, at the exact moment when the sniper fired the shots, the suspect's rifle was aimed at an exposed officer.

This case is distinguishable from *Livermore* on at least two grounds, each pertinent to the *Garner* excessive force standard. First, while in *Livermore* the suspect was known by every officer on the scene to have a rifle, Mattingly did not know Newby had a weapon. Second, the crimes committed by the *Livermore* suspect go to the heart of *Garner*'s standard–"crime[s] involving the infliction or threatened infliction of serious physical harm." Despite the disputed issue of fact about whether the *Livermore* suspect was aiming at the police at the precise instant he was shot, he had aimed his weapon at them only moments before. He had set buildings on fire. He had participated in an armed standoff with the police in which shots were fired at a passing helicopter. None of those aggravating facts is present in this case.

4

We acknowledge that in challenges to official action, particularly police action in the heat of the moment, courts must be careful to avoid unduly burdening officers' ability to make split-second decisions. Effective policing requires that courts accord police officers a certain latitude to make mistakes. There seems to be little doubt that Mattingly was flustered and nervous. We might well have been nervous in his situation. The legal standard, however, is objective. Even a split-second decision, if sufficiently wrong, may not be protected by qualified immunity.

Viewing the facts in the light most favorable to Bouggess, Mattingly lacked probable cause to believe Newby posed a serious danger to him or to the public. On an interlocutory appeal of the denial of summary judgment on qualified immunity grounds, our jurisdiction generally extends only to resolving issues of law. *Johnson*, 515 U.S. at 319-20. There are disputed issues of fact that go to the heart of this case. They "should be reserved for the jury." *Sigley v. City of Parma Heights*, 437 F.3d at 536.

C

Our next step is to determine whether the right at issue was clearly established on the date of the shooting. *Baranski*, 452 F.3d at 438 (quoting *Saucier*, 533 U.S. at 202). Qualified immunity shields an officer from suit even when his action violates constitutional rights, as long as he

"reasonably misapprehends the law governing the circumstances." *Brosseau*, 543 U.S. at 198. It is designed to provide "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S 335, 341 (1986). In other words, an officer will be denied qualified immunity if he violates a statutory or constitutional right that was "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

The question in this case, therefore, is whether Mattingly reasonably could have thought that he had probable cause to believe that Newby posed a serious danger to Mattingly or to others. Under the facts viewed in the light most favorable to Bouggess, Newby was (a) present at a crack deal; (b) uttered no threatening remarks toward Mattingly or anybody else; (c) never drew a weapon; (d) struggled with Mattingly in order to flee; (e) did not reach for Mattingly's gun; (f) did not fire Mattingly's gun at Mattingly's foot; (g) broke free from Mattingly and ran away, facing away from Mattingly; and (h) was shot three times in the back.

1

Viewing the facts that way, no reasonable officer could have thought he had probable cause to use deadly force against Newby. In *Garner*, 471 U.S. at 11-12, the Supreme Court wrote:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Certainly, *Garner*'s statement of the governing law may be applied differently in particular sets of circumstances, and reasonable minds can disagree over precisely which circumstances justify the use of deadly force.

Nevertheless, the Supreme Court has recognized that there are obvious cases in which an officer should have been on notice that his conduct violated constitutional rights, despite the generalized nature of that Court's pronouncements of constitutional standards. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Our circuit and others have held that some cases can be so obvious under *Garner* and governing circuit precedent that officers should be presumed to have been aware that their conduct violated constitutional standards. *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988) and *Dickerson*, 101 F.3d at 1163). *See also Craighead*, 399 F.3d at 962 (denying qualified immunity when an officer shot an individual holding a gun when testimony diverged as to whether the gun was pointed upward or at the officer).

This is such an obvious case. Within this circuit, *Dickerson* established, more than ten years ago, that conduct like that committed by Mattingly violates the Fourth Amendment. In that case, there was uncontroverted evidence of serious danger to the officers stemming from the suspect's

clear possession of a weapon, his recent firing of his weapon, and his threatening language toward the police. Nevertheless, examining the moment immediately preceding the shooting, the *Dickerson* court determined that, because it was disputed whether the suspect was non-threatening *when he was shot*, the officer was not entitled to qualified immunity. 101 F.3d at 1162. *See also Bibb*, 840 F.2d at 350 (holding that where an officer caught a suspect dismantling the officer's car and then warned the suspect to stop, the officer was not entitled to qualified immunity for shooting and killing the suspect mid-flight).

This case most closely parallels an unpublished decision issued by the court in 2000. In *Sigley v. Kuhn*, 2000 U.S. App. LEXIS 1465, at *15, we denied qualified immunity to an officer who employed deadly force against a drunk driver whom he had pulled over. In *Sigley*, it was an undisputed fact that, after the officer had administered field sobriety tests, the driver dropped to his knees and begged to be released. When the officer sought to bring the driver to his feet, the driver "tackled him and the two began struggling on the ground." *Id.* at *2. The officer claimed that the two men were struggling for the officer's gun and that, when the officer prevailed in the struggle, he shot the driver twice. The driver claimed that he merely rolled away from the officer, whereupon the officer opened fire, shooting him twice in the back. *Id.* at *3. That factual dispute required the denial of qualified immunity.

So it is in this case. Mattingly and Newby struggled, perhaps over a gun, perhaps not. Newby fled, maybe posing a serious risk to Mattingly or to others, maybe not. We cannot resolve those doubts on an interlocutory appeal. *Johnson*, 515 U.S. at 319-20. Viewing the facts in the light most favorable to Bouggess, Mattingly should have been aware that his actions violated clearly established constitutional rights. *See, e.g.*, *Garner*, 417 U.S. at 10-12; *Dickerson*, 101 F.3d at 1152-62; *Sigley*, 2000 U.S. App. LEXIS at *2-3.

2

Mattingly does not offer a convincing rebuttal to this conclusion. The cases he cites all stand for the proposition that, when a police officer both knows a defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or others, the officer is justified in using deadly force. *See, e.g.*, *Gaddis*, 364 F.3d at 767; *Boyd*, 215 F.3d at 600. However, even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified. *Dickerson*, 101 F.3d at 1160-62; *Brandenburg*, 882 F.2d at 213-14; *Craighead*, 399 F.3d at 962. *See also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 901, 903-05 (6th Cir. 1998) (denying qualified immunity to officers who shot deranged suspect armed with butcher knives, because there were disputed facts as to whether suspect posed a threat to the officers rather than merely to himself). In other words, mere possession of a weapon is not enough to satisfy Mattingly's burden at this stage.[7]

Mattingly tries to resist this conclusion by arguing that "an exigency exists when officers demonstrate that a suspect has a willingness to use a weapon." *Reply Br. of Appellant*, at 8 (citing *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006)). He contends that, because Newby "fought with Officer Mattingly and attempted to take his gun away from him[, one] can only assume Newby's only purpose . . . was to [use the gun] against [Mattingly]." *Reply Br. of Appellant*, at 6 (citing *Leong v. City of Detroit*, 151 F. Supp. 2d 858, 868 (E.D. Mich 2001) (holding that officers were justified in using force because suspect had shown propensity to use the shotgun he carried)). Mattingly's contentions rest on suppositions–that the gun was drawn during the struggle and that

---

[7]We have no quarrel with the argument that an officer who knows that a suspect possesses a gun can more easily conclude that the suspect poses a risk of serious harm to him or to others. But that does not help Mattingly in this case, for on the facts as we must construe them here he did not know Newby had a firearm. *Cf. Graham*, 490 U.S. at 397.

Newby tried to take it from him–that we cannot accept at this stage. We cannot immunize Mattingly from suit by resolving disputes of material fact in his favor. *Johnson*, 515 U.S. at 319-20.

In this case, viewing the facts in the light most favorable to Bouggess, Mattingly violated Newby's Fourth Amendment rights by shooting him dead without "probable cause to believe" that he posed "a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11-12. That right was clearly established at the time the shooting took place. *Ibid. See also Dickerson*, 101 F.3d at 1162; *Sova*, 142 F.3d at 903. When "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the "jury becomes the final arbiter of [a] claim of immunity." *Brandenburg*, 882 F.2d at 215-16. *See also Sova*, 142 F.3d at 903. We thus agree with the district court. Mattingly was not entitled to summary judgment on Bouggess's § 1983 claim.

IV

The remaining issue for our decision is whether Mattingly is entitled to state-law official immunity on Bouggess's state-law claims. The district court held that Mattingly was not entitled to such immunity. We agree.

Under Kentucky law, when sued in their individual capacities, "public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). However, the Kentucky Supreme Court has made clear that a finding of "bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known . . . , *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id*. at 523. *Accord Ali v. City of Louisville*, 395 F. Supp. 2d 527, 541 (W.D. Ky. 2005).

Viewing the facts in the light most favorable to Bouggess, Mattingly's actions violated clearly established federal constitutional law and thus were taken in bad faith. We need go no further than that to hold that Mattingly is not entitled to state-law official immunity for his actions at this stage.

V

The district court denied Mattingly's motion for summary judgment on qualified immunity and state-law immunity grounds. Under the facts as we must construe them, Mattingly violated Newby's clearly established constitutional rights. We thus AFFIRM the judgment of the district court and REMAND the case for further proceedings.